[Cite as *Walker v. Ford Motor Co.*, 2014-Ohio-4208.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100759**

## BRETT H. WALKER

PLAINTIFF-APPELLEE

vs.

## FORD MOTOR CO., ET AL.

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-10-717986

**BEFORE:** Rocco, J., Celebrezze, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** September 25, 2014

**ATTORNEYS FOR APPELLANT**

Kirk R. Henrikson
Shana A. Samson
Matty, Henrikson & Greve
55 Public Square, Suite 1775
Cleveland, Ohio 44113

Timothy J. Krantz
Ford Motor Company
17601 Brookpark Rd.
Brook Park, Ohio 44142

**ATTORNEYS FOR APPELLEE**

Shawn M. Acton
Ryan J. Cavanaugh
Brian P. Kelley
Kelley & Ferraro, L.L.P.
2200 Key Tower
127 Public Square
Cleveland, Ohio 44113

**Also listed:**

**ATTORNEY FOR BUREAU OF WORKERS' COMPENSATION**

Michael DeWine
Ohio Attorney General

BY: Michael J. Zidar
Assistant Attorney General
615 West Superior Avenue, 11th Floor
Cleveland, Ohio 44113

KENNETH A. ROCCO, J.:

{¶1} Defendant-appellant Ford Motor Co. ("Ford") appeals from a jury verdict finding that plaintiff-appellee Brett Walker ("Walker" or "plaintiff") is entitled to participate in the Ohio workers' compensation system for the condition of Hodgkin's lymphoma due to his occupational exposure to asbestos while working for Ford. Ford asserts that the trial court failed to properly apply Evid.R. 702 and abused its discretion in admitting unreliable, unscientific expert testimony in support of Walker's claim that his Hodgkin's lymphoma was caused by his exposure to asbestos at Ford. Ford also contends that (1) the trial court erred in denying its motion for a directed verdict based on Walker's alleged failure to present admissible evidence of proximate cause and (2) the jury's verdict should be vacated because it was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment.

**Procedural History and Facts**

{¶2} Walker commenced this action as an appeal, pursuant to R.C. 4123.512, after the Industrial Commission of Ohio denied his claim for workers' compensation benefits. Walker alleged that he contracted Hodgkin's lymphoma and asbestosis as a result of his occupational exposure to asbestos while working for Ford at its Brookpark, Ohio facility from 1973-1997. Ford denied that Walker contracted asbestosis or Hodgkin's lymphoma as a result of his employment at Ford and disputed that Walker's Hodgkin's lymphoma could have been caused by his exposure to asbestos.

{¶3} On October 30, 2013, a few days before the scheduled trial date, Ford filed a motion in limine to strike the testimony of one of Walker's expert witnesses, Dr. Carlos Bedrossian. Ford argued that the trial court should exclude Dr. Bedrossian's opinions on the issues of general and specific causation because his testimony did not meet the requirements of Evid.R. 702. Ford claimed that Dr. Bedrossian's causation opinions were based on "unreliable principles and methods" and lacked a sufficient foundation because "the vast amount of medical literature, articles and treatises indicate that asbestos exposure does not cause Hodgkin's disease." In support of its motion, Ford attached a copy of Dr. Bedrossian's videotaped trial deposition, taken on October 23, 2013, and several articles and texts that Dr. Bedrossian claimed supported his opinions. After hearing argument by the parties, the trial court denied the motion. A three-day jury trial commenced on November 13, 2013. A summary of the relevant testimony and other evidence presented at trial follows.

{¶4} For 24 years, from 1973-1997, Walker was employed at Ford's foundry (also known as the Cleveland Casting Plant) in Brookpark, Ohio. During 1973-1988, Walker worked primarily as a resinate core machine operator, "making the sand hard" so that metal could be poured on the material when it went into the metal room. As he worked, he would climb on the sides of the machine "to pack the sand down," surrounded by pipes running to the machines and overhead. From 1989-1997, Walker worked as a core fit assembler, and, from time to time, was loaned out to perform other jobs around the plant. Walker testified that pipes were "all over" the foundry and that he worked around pipes from 6 to 12 hours each day. According to Walker, the pipe covering was,

at times, in a "state of disrepair" and would "come loose," generating dust that Walker breathed in as he worked. Although he did not know it at the time, Walker testified that he believed that this pipe covering contained asbestos.

{¶5} Walker was diagnosed with Hodgkin's lymphoma in 2002. He testified that he never smoked, had no family history of lymphoma, and never had the Epstein-Barr virus.

{¶6} In addition to his own testimony, Walker presented the testimony of two expert witnesses, Dr. Laxminarayana Rao and Dr. Bedrossian,[1] and introduced records documenting the existence of asbestos-containing materials at the Ford facility. Dr. Rao, a board-certified physician in internal medicine and pulmonary medicine and a NIOSH-certified B-reader, testified primarily regarding Walker's asbestosis claim. Dr. Rao testified that he was asked to review a chest x-ray of Walker's lung taken in 2002 to determine whether there were signs of fibrotic changes or damage to Walker's lung tissue consistent with asbestos-related pulmonary disease. Dr. Rao testified that upon his review of Walker's chest x-ray, he observed "mild" scarring of the lung tissue consistent with asbestosis, but did not observe any damage to the pleura, i.e., the membrane covering the lung tissue. Assuming "proper exposure to asbestos," Dr. Rao testified that he would attribute the scarring he observed on Walker's chest x-ray to asbestos exposure. Dr. Rao did not offer any opinions regarding the cause of Walker's Hodgkin's lymphoma.

---

[1]All of the expert witnesses who testified in the case testified by means of videotaped trial depositions.

{¶7} Dr. Bedrossian is a pathologist, board-certified in anatomical and clinical pathology, with a subspecialty in cytology. He testified that he has written chapters in books and articles on asbestos-related diseases and has taught classes and given numerous lectures on the topic. He testified that he has personally been involved in a dozen cases of asbestos-related lymphoma, but that because it was a "rare condition," he had only been involved in two prior cases involving asbestos-related Hodgkin's lymphoma. Although he has authored hundreds of articles and presented hundreds of lectures on asbestos-related diseases during the 22 years he has studied asbestos-related diseases, Dr. Bedrossian acknowledged that he had never written any articles, participated in any studies, or given any lectures specifically linking Hodgkin's lymphoma to asbestos exposure.

{¶8} Dr. Bedrossian explained that lymphoma is a cancer of the lymphatic system and that there are different types of lymphomas, classified, "for therapeutic purposes," according to the predominant cell type observed when the tumor is viewed under a microscope. He testified that, from a causation standpoint, "a lymphoma is a lymphoma" regardless of the cellular differences between different types of lymphoma and opined that all types of lymphomas can be caused by exposure to asbestos.

{¶9} As to the methodology he used in formulating his opinions, Dr. Bedrossian testified that his opinions were based on his personal knowledge, his education, training, and experience, his review of Walker's medical records, occupational history, and the available pathology materials, and his review of the medical literature concerning asbestos and asbestos-related cancers.

{¶10} With respect to the medical literature he relied upon, Dr. Bedrossian identified several studies and articles that he contended supported his opinions, including (1) a 2010 article detailing a study of Korean foundry workers that found a higher incidence of cancer among foundry workers than those in the general population, (2) a 2012 case study of a lathe worker involving mucosa-associated lymphoid tissue or "MALT" lymphoma, (3) a 1982 article reporting on a study of asbestos exposure and lymphomas of the gastrointestinal tract and oral cavity, and (4) a 2001 review of epidemiological literature that reported a "weakly-increased risk" of malignant lymphomas in workers exposed to asbestos. Although he acknowledged that most of the lymphomas referenced in the articles he relied upon involved different areas of the body, he claimed the studies were nevertheless significant because they showed that "as long as asbestos reaches an area, regardless of where it is, it can cause different types of cancer." On cross-examination, Ford challenged Dr. Bedrossian's reliance on these studies, claiming that they (1) did not establish a direct causal relationship between lymphoma and asbestos exposure — much less between Hodgkin's lymphoma and asbestos exposure, (2) involved different populations and diseases, and (3) either did not support the specific propositions for which they were cited by Dr. Bedrossian or contradicted them outright. For example, Ford's counsel pointed out that the Korean study involved workers who were exposed to a number of different carcinogens, including asbestos, and did not specifically address the impact of asbestos exposure on the population studied and that it was reported in the article regarding the MALT study that the worker involved had no asbestos exposure.

{¶11} Ford's counsel also confronted Dr. Bedrossian with other more recent, more comprehensive (and arguably more relevant) studies and articles setting forth an opposing view, i.e., that there is no evidence of a causal link between asbestos exposure and lymphoma. Although Dr. Bedrossian admitted that none of the studies he relied upon established a "verbatim [causal] connection" between Hodgkin's lymphoma and asbestos exposure, he claimed that such a connection was unnecessary for him to opine that Hodgkin's lymphoma could be caused by asbestos exposure. Dr. Bedrossian further testified that although certain articles he relied upon indicated that "the association between asbestos exposure and lymphomagenesis remains controversial" or reported only a finding of a "weakly increased risk" of lymphoma as a result of asbestos exposure, it did not negate the significance of the underlying studies and their positive findings. Dr. Bedrossian also explained the specific biological processes and mechanisms by which asbestos could enter the body, travel to the lymphatic system, attack the lymph nodes, alter cells and DNA, and ultimately cause lymphoma and testified that the presence of asbestos fibers in the lymph nodes had been previously documented by another scientist and reported in the scientific literature. Ford did not object to Dr. Bedrossian's testimony regarding his interpretation of the medical literature or to his testimony regarding the specific mechanisms by which asbestos could cause lymphoma.

{¶12} Based on the "totality" of the medical literature, his personal knowledge and experience, and (1) evidence that Walker had worked in a foundry, had been exposed to asbestos at the foundry, had signs of asbestosis, and had the proper latency period, (2) his assumption that Walker had been exposed to and breathed in a significant amount of

airborne asbestos during the time he worked for Ford, and (3) his exclusion of other possible causes of Hodgkin's lymphoma, including the Epstein-Barr virus and cigarette smoking, Dr. Bedrossian opined, to a reasonable degree of medical certainty, that Walker's employment with Ford created a "higher risk" of developing lymphoma than that faced by the public generally, that asbestos could cause Hodgkin's lymphoma, that asbestos was the "causative agent" of Walker's Hodgkin's lymphoma, and that Walker had contracted Hodgkin's lymphoma as a result of his asbestos exposure at Ford.

{¶13} At the close of plaintiff's case-in-chief, Ford renewed its motion to strike Dr. Bedrossian's testimony and moved for a directed verdict, arguing that the medical literature Dr. Bedrossian relied upon in support of his opinions did not indicate a probable causal link between asbestos exposure and Hodgkin's lymphoma, and that Walker, therefore, lacked sufficient evidence from which the jury could reasonably find that his Hodgkin's lymphoma was caused by exposure to asbestos during his employment at Ford. After careful consideration, the trial court denied Ford's motions.

{¶14} The trial continued. Ford presented the testimony of two expert witnesses in support of its defense: Dr. David Rosenberg, a physician board-certified in internal medicine, pulmonary disease, and occupational medicine and a certified B-reader, and Dr. Russell Harvey, a board-certified pathologist, specializing in pathology of the lungs. These experts disputed plaintiff's claim that asbestos exposure can cause Hodgkin's lymphoma. They testified that the medical literature supported their contrary opinion that Hodgkin's lymphoma was not causally related to asbestos exposure and that they were unable to find a single study that conclusively linked Hodgkin's lymphoma to

asbestos exposure. Dr. Harvey also disputed Dr. Bedrossian's assertion that a "lymphoma is a lymphoma" and testified that there are "distinct differences" between Hodgkin's lymphoma and non-Hodgkin's lymphoma with respect to treatment, prognosis, and cause. Each defense expert further opined that Walker's Hodgkin's lymphoma was not related to any asbestos exposure — much less any asbestos exposure while working at Ford.

{¶15} Dr. Rosenberg examined Walker in 2006. He testified that based on his examination and his review of a May 2006 chest x-ray and various CT scans from 2004 and 2006, he detected no restriction or crackles in Walker's lungs and saw no evidence of diffuse interstitial fibrosis or pleural plaque formation that would be indicative of asbestosis. Ford also introduced evidence of reports of other chest x-rays and CT scans taken by the Cleveland Clinic during 2001-2004 in connection with Walker's diagnosis and treatment, which indicated that Walker's lungs were clear and that no significant pulmonary parenchymal abnormalities were observed.

{¶16} At the close of all the evidence, Ford renewed its motion for a directed verdict, arguing, once again, that the available medical literature did not support a causal link between Hodgkin's lymphoma and asbestos exposure and that, in the absence of evidence of asbestos bodies in the lung or lymph node tissue, Dr. Bedrossian's theory that asbestos traveled into the lymph nodes and caused Walker's Hodgkin's lymphoma was speculative and did not satisfy Walker's burden of proof on causation. Once again, the trial court denied Ford's motion.

**{¶17}** On November 15, 2013, the jury returned its verdict. The jury found that Walker was entitled to participate in the Ohio workers' compensation system for the condition of Hodgkin's lymphoma but not for the condition of asbestosis.

**{¶18}** Ford appeals the trial court's judgment, presenting four assignments of error for review:

> Assignment of Error 1: The trial court abused its discretion in denying Ford's motion in limine to exclude the testimony of plaintiff's expert, Dr. Carlos Bedrossian, on the ground that said evidence did not comply with Rule 702 of the Ohio Rules of Evidence.
>
> Assignment of Error 2: The trial court erred to the prejudice of Ford in denying Ford's motion for directed verdict where plaintiff failed to satisfy his burden of proof at trial to show, by a preponderance of the evidence, that the alleged condition arose out of and in the course of employment or that a proximate causal relationship exists between the employment and the alleged condition.
>
> Assignment of Error 3: The trial court's verdict is based upon insufficient evidence.
>
> Assignment of Error 4: The trial court's verdict is against the manifest weight of the evidence.

**Establishing a Right to Participate in the Ohio Workers' Compensation System — Elements of Plaintiff's Claim**

**{¶19}** Pursuant to R.C. 4123.68, "[e]very employee who is disabled because of the contraction of an occupational disease" is entitled to participate in the Ohio workers' compensation system. R.C. 4123.68 lists a number of diseases that have been designated as "scheduled" occupational diseases. Because Hodgkin's lymphoma is not one of the occupational diseases specified in R.C. 4123.68, Walker bore the burden of

demonstrating that his condition qualified as an occupational disease, entitling him to participate in the Ohio workers' compensation system.

{¶20} R.C. 4123.01(F) defines an "occupational disease" as

a disease contracted in the course of employment, which by its causes and the characteristics of its manifestation or the condition of the employment results in a hazard which distinguishes the employment in character from employment generally, and the employment creates a risk of contracting the disease in greater degree and in a different manner from the public in general.

The Ohio Supreme Court has set forth a three-part test for determining whether a disease qualifies as an occupational disease: (1) the disease was contracted in the course of employment; (2) the disease, by causes and the characteristics of its manifestation or the conditions of the employment, result in a hazard that distinguishes the employment from employment generally, and (3) the employment creates a risk of contracting the disease in a greater degree and in a different manner than in the public generally. *State ex rel. Ohio Bell Tel. Co. v. Krise*, 42 Ohio St.2d 247, 327 N.E.2d 756 (1975), syllabus. To demonstrate that a disease was "contracted" in the course of employment, a plaintiff must establish a direct and proximate causal relationship between the employment and the plaintiff's disease. *See Fox v. Indus. Comm. of Ohio*, 162 Ohio St. 569, 125 N.E.2d 1 (1955), paragraph one of the syllabus; *Welsh v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 94068, 2011-Ohio-448, ¶ 20.

{¶21} Where, as here, a plaintiff claims that exposure to a toxic substance caused his disease, the plaintiff must establish both general causation — i.e., that the toxic substance is capable of causing the particular disease — and specific causation — i.e., that the plaintiff's disease was in fact caused by the toxic substance. *Terry v. Caputo,*

115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 15.  Expert medical testimony is generally necessary to establish both general and specific causation.  *Valentine v. PPG Industries, Inc.*, 158 Ohio App.3d 615, 2004-Ohio-4521, 821 N.E.2d 580, ¶ 17 (4th Dist.), *aff'd*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683.  Thus, because Walker alleges that his Hodgkin's lymphoma was caused by his exposure to asbestos at Ford,[2] to prevail on his claim of entitlement to participate in the workers' compensation system based on the condition of Hodgkin's lymphoma, Walker was required to present expert medical evidence establishing both that: (1) Hodgkin's lymphoma can be caused by exposure to asbestos and (2) his Hodgkin's lymphoma was caused by his asbestos exposure at Ford.

**Admissibility of Testimony of Dr. Carlos Bedrossian**

**{¶22}** In its first assignment of error, Ford argues that the trial court abused its discretion in permitting Dr. Bedrossian to testify on the issue of causation.  Ford asserts that Dr. Bedrossian's causation testimony should have been excluded because: (1) Dr. Bedrossian was not qualified, under Evid.R. 702(B), to offer an opinion that Hodgkin's lymphoma can be caused by asbestos exposure and (2) Dr. Bedrossian's opinions were not sufficiently reliable under Evid.R. 702(C).

**{¶23}** The determination of the admissibility of expert testimony is within the discretion of the trial court.  Evid.R. 104(A).  A trial court's decision to admit or exclude expert testimony will not be reversed absent an abuse of discretion.  *Valentine v.*

---

[2]Although Walker testified that he was exposed to other toxic substances while working at Ford, he did not allege that his exposure to any of these other allegedly toxic substances was a cause of his Hodgkin's lymphoma.

*Conrad,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 68, ¶ 9; *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607, 616, 687 N.E.2d 735. Application of an abuse of discretion standard means that a trial court has a range of choices. Thus, there are instances in which we will affirm a trial court's decision under an abuse of discretion standard of review even though we would have decided differently had it been our decision to make in the first instance. *See United States v. Brown,* 415 F.3d 1257, 1266 (11th Cir.2005) (explaining why "'the task of evaluating the reliability of expert testimony is uniquely entrusted to the [trial court] under *Daubert*'" and why appellate courts give trial courts "'considerable leeway in the execution of [this] duty'"), quoting *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005) (citations omitted). An abuse of discretion means more than an error of law or judgment; it implies an attitude of unreasonableness, arbitrariness, or unconscionability on the part of the trial court. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "Without those elements, it is not the role of this court to substitute its judgment for that of the trial court." *Valentine* at ¶ 9, citing *Calderon v. Sharkey,* 70 Ohio St.2d 218, 222, 436 N.E.2d 1008 (1982). Furthermore, as this court has previously stated, "[i]n workers' compensation appeals, a judge's discretion in evidentiary rulings" is properly exercised "to resolve close questions in favor of injured workers." *Allen v. Conrad,* 141 Ohio App.3d 176, 182, 750 N.E.2d 627 (8th Dist.2001). We believe this case involves one of those "close questions."[3]

---

[3] We are mindful, however, that appellate review under an abuse of discretion standard still entails "review." *See Valentine v. PPG Industries, Inc.,* 158 Ohio App.3d 615, 2004-Ohio-4521, 821 N.E.2d 580, ¶ 14 (4th Dist.), *aff'd,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683 (rejecting contention that liberal nature of workers' compensation laws requires courts to lower standard for admitting expert testimony or proving causation; "[w]hile workers' compensation statutes should be

**{¶24}** Evid. R. 702 provides:

A witness may testify as an expert if all of the following apply:

 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other

specialized information. * * *

**{¶25}** Walker, as the party offering the expert, had the burden of establishing the admissibility of Dr. Bedrossian's testimony. *See, e.g., Marcus v. Rusk Heating & Cooling, Inc.*, 12th Dist. Clermont No. CA2012-03-026, 2013-Ohio-528, ¶ 27 ("the party offering the expert opinion and testimony bears the burden of proof in establishing its admissibility"); *State v. Ream*, 3d Dist. Allen No. 1-12-39, 2013-Ohio-4319, ¶ 82 ("The proponent of the expert testimony has the burden to prove the admissibility of the testimony under Evid.R. 702.").

**{¶26}** "The qualification and reliability requirements of Evid.R. 702 are distinct." *Valentine,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 68 at ¶ 17. "Because even a qualified expert is capable of rendering scientifically unreliable testimony," a trial court, as gatekeeper, must evaluate the reliability of the specific opinions offered by the expert. *Id.*, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct.

---

liberally construed in favor of the injured worker, this does not mean we are free to ignore the legal principles that control the admissibility of expert testimony and the Supreme Court of Ohio's pronouncements on proximate cause").

2786, 125 L.Ed.2d 469 (1993), and *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

**{¶27}** With respect to the reliability of an expert's opinions, Evid.R. 702(C) provides that where expert testimony involves "the result of a procedure, test, or experiment," the testimony "is reliable only if all of the following apply":

> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

**{¶28}** *Miller*, *supra*, and *Daubert, supra*, further provide that in "evaluating the reliability of scientific evidence, several factors are to be considered":

> (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance.

*Miller,* 80 Ohio St.3d at 611, 687 N.E.2d 735, citing *Daubert,* 509 U.S. at 593-594, 113 S.Ct. 2786, 125 L.E.2d 469. These factors are not a "definitive checklist or test" to be rigidly applied, but rather, are intended to serve as guidelines for the trial court in assessing reliability under Evid.R. 702. *Daubert* at 593; *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 199 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case[.]"). The inquiry under Evid.R. 702 remains "a flexible one," dependent upon "the nature of the issue, the expert's particular expertise, and the subject of his testimony."

*Id.* at 150. Expert testimony that does not meet all or even most of the *Daubert* factors may, at times, be admissible. The "'ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's "technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results."'" *Miller* at 614, quoting *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 956 (3d Cir.1990), quoting 3 *Weinstein's Evidence*, Section 702[03] at 702-35 (1988).

{¶29} In determining whether an expert's opinions are reliable under Evid.R. 702(C), the court's focus is on whether the expert's conclusions are based on scientifically valid principles and methods, i.e., how the expert arrived at his or her conclusions, not whether the expert's conclusions are correct. *See, e.g., State Farm Fire & Cas. Co. v. Holland*, 12th Dist. Madison No. CA2007-08-025, 2008-Ohio-4436, ¶ 21, citing *Miller* at paragraph one of the syllabus; *Valentine* at ¶ 16.

{¶30} As the Ohio Supreme Court explained in *State v. Nemeth*, 82 Ohio St.3d 202, 210, 694 N.E.2d 1332, an expert's opinion need not be generally accepted in the scientific community to be sufficiently reliable to support a jury finding:

> [S]cientific opinions need not enjoy "general acceptance" in the relevant scientific community in order to satisfy the reliability requirement of Evid.R. 702. Further, there need not be any agreement in the scientific community regarding the expert's actual opinion or conclusion. The credibility of the conclusion and the relative weight it should enjoy are determinations left to the trier of fact. *See, e.g., State v. Buell*, 22 Ohio St.3d 124, 132-133, 489 N.E.2d 795, 804 (1986). "'General scientific acceptance' is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion." (Footnote omitted.) *State v. Williams*, 4 Ohio St.3d at 57, 446 N.E.2d at 447, citing McCormick, *Evidence* (2 Ed. Cleary Ed. 1972) 491, Section 203.

Even a novel or "controversial"opinion may be reliable if founded on

> a proper methodology. *See, e.g., Shepard v. Grand Trunk W. RR.*, 8th Dist. Cuyahoga No. 92711, 2010-Ohio-1853, ¶ 54 (where expert "relied on several sound scientific sources" in forming his opinion, trial court did not abuse its discretion in allowing expert to testify regarding the causal relationship between laryngeal cancer and asbestos exposure notwithstanding contention that it was "controversial").

{¶31} In this case, there is no dispute that Dr. Bedrossian's testimony relates to matters beyond the knowledge or experience possessed by lay persons. Evid.R. 702(A). Nor can it reasonably be disputed Dr. Bedrossian is sufficiently qualified to testify, generally, as an expert witness on the subjects of Hodgkin's lymphoma and asbestos-related diseases. Evid.R. 702(B).

{¶32} However, Ford maintains that, notwithstanding his qualifications, Dr. Bedrossian's specific opinions in this case exceeded the scope of his expertise. Ford argues that Dr. Bedrossian lacks the "specialized knowledge or experience" necessary to testify, based on his own knowledge, education, and experience, that a causal relationship exists between Hodgkin's lymphoma and asbestos exposure. In support of its argument, Ford points out that in 22 years, Dr. Bedrossian has consulted on only two other cases of Hodgkin's lymphoma related to asbestos exposure, has not conducted any research or

studies related to determining the causes of Hodgkin's lymphoma, and has not conducted any studies, authored any articles, or presented any lectures "linking asbestos exposure to Hodgkin's lymphoma."[4] As a result, Ford claims Dr. Bedrossian has not performed the necessary studies or been involved in the development of the medical literature to a sufficient degree to be qualified to opine that there is a causal link.

{¶33} Ford also contends that even if Dr. Bedrossian was qualified to testify regarding causation, his causation testimony should have been excluded because he used "unreliable methods" and lacked a sufficient foundation for his opinions regarding causation. Specifically, Ford asserts that Dr. Bedrossian's opinions were unreliable because (1) none of the articles identified by Dr. Bedrossian as supporting his opinions "specifically references a causal connection between asbestos exposure and Hodgkin's lymphoma," (2) none of Walker's treating physicians ever made a finding that his Hodgkin's lymphoma was asbestos-related, (3) no asbestos bodies were found in the slides of Walker's tumor, and (4) the jury determined that there was insufficient evidence to support Walker's asbestosis claim. After a full and careful review of the record, we cannot say that the trial court abused its discretion in admitting Dr. Bedrossian's testimony in this case.

{¶34} As noted above, Dr. Bedrossian testified that he had been involved in a dozen prior cases of asbestos-related lymphomas, including two prior cases of

---

[4] Although Dr. Bedrossian purportedly has a 50-page curriculum vitae, detailing all of the education and experience that purportedly qualifies him to testify as an expert witness in this case, that curriculum vitae was not included with the briefing on the motion in limine to exclude Dr. Bedrossian's testimony and does not otherwise appear in the record.

asbestos-related Hodgkin's lymphoma.   Although it is unclear to this court, based on the record before us, how it was determined, in each of those cases, that the disease at issue was caused by asbestos exposure, Ford did not object to or otherwise challenge this testimony.[5]   In addition, Dr. Bedrossian explained how different types of lymphomas are classified, i.e., by cell type, and the significance of those classifications.   Dr. Bedrossian also explained in detail the specific biological mechanisms by which he contended asbestos could cause lymphoma.   Once again, Ford did not challenge this testimony or offer any testimony rebutting Dr. Bedrossian's theory as to how asbestos could cause lymphoma.   Indeed, Ford's expert, Dr. Harley, acknowledged that asbestos particles "can migrate around inside the body to some extent and cause disease in places other than the lungs" and that asbestos fibers do travel to the lymphatic system and can get into the lymph nodes.

{¶35} With respect to the scientific literature supporting Dr. Bedrossian's opinions,[6] it is undisputed that none of the studies or texts relied upon by Dr. Bedrossian in support of his opinions establishes a specific link between Hodgkin's lymphoma and asbestos.   However, we do not believe, as Ford claims, that this is fatal to Dr.

_____

[5] Dr. Bedrossian was not questioned by either party regarding this issue.   Judges are not scientists and are limited by the evidence presented by the parties in resolving *Daubert* issues.

[6] Evid.R. 702(C) does not explicitly require an expert to rely on scientific or medical literature for his or her testimony to be deemed reliable.  A physician's experience, without further supporting medical literature, may, under certain circumstances, supply the foundation for a reliable expert opinion. *Kinn v. HCR ManorCar*e, 6th Dist. Lucas No. L-12-1215, 2013-Ohio-4086, ¶ 19, citing  *Theis v. Lane*, 6th Dist. Wood No. WD-12-047, 2013-Ohio-729. However, this generally applies only in cases in which the scientific theory upon which the opinion rests is not a novel one requiring a *Daubert* analysis.   *Id.*, citing *Theis* at ¶ 14-16.

Bedrossian's opinions in this case. There is no requirement under Evid.R. 702(C) that a causation opinion be backed by a specific epidemiological study. Further, it is well established that experts "may draw inferences from a body of work," provided that "any such extrapolation accords with scientific principles and methods." *Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 18. While an expert's opinions may be properly excluded where the expert's opinions are not sufficiently supported by the studies on which the expert purports to rely, i.e., where "there is simply too great an analytical gap between the data and the opinion proffered," *Joiner*, 522 U.S. at 144-146, 118 S.Ct. 512, 139 L.Ed.2d 508, a difference of opinion regarding the interpretation of scientific literature or the significance of a particular article or study, is not, in and of itself, grounds for exclusion of an expert's opinions under Evid.R. 702(C). Such disagreements are simply part and parcel of a "battle of the experts" and go to credibility of, and the weight to be given, an expert's opinions, rather than their admissibility.

{¶36} In this case, Dr. Bedrossian identified several articles and texts within the scientific literature that he interpreted as establishing a link between asbestos exposure and other types of lymphoma. Dr. Bedrossian explained the scientific basis behind his extrapolation of the results of studies involving other types of lymphoma to Hodgkin's lymphoma, in part, as follows:

> In this particular one [the 1982 article], they did an epidemiological survey and they did the survey in individuals that were exposed to asbestos, and they looked specifically at lymphohematopoietic cancers and they found that between 1977 and 1981, they found 26 cases of large cell lymphoma which is one of the subtypes of malignant lymphoma that I mentioned before.

In this particular instance, most of the lymphomas were in the area surrounding the GI tract so the previous article was in the areas surrounding the lung. And this particular one is in the area surrounding the GI tract.

I chose this article to demonstrate that as long as asbestos reaches an area, regardless of where it is, it can cause different types of cancer. In the GI tract, it can cause carcinoma of the stomach, carcinoma of the colon, but it can also cause lymphoma, and this is an example of such occurrence.

**{¶37}** On cross-examination, he further explained the role the medical literature played in the formulation of his opinions as follows:

I operate in real life, in real time, in a real patient, and my conclusions are in the examination of the evidence of Mr. Walker.
 * * * I look at the entire evidence, at the clinical records, at the literature, at my own experience, and I draw my conclusions.

* * *
I quoted studies that said there is a weakly-increased risk. I gave you examples of articles where they found lymphomas in the GI tract, in the lung in patients that were — that had occupations similar to Mr. Walker. And I gave you examples of articles where they found asbestos bodies in lymph nodes in the area of the lung where he developed his lymphoma. And I gave you articles where they had a number of lymphomas including all cell types including Hodgkin's lymphoma. * * * If I have a cause in front of me and I have absence of Epstein-Barr virus, I have absence of cigarette smoking, I have no other explanation, I have prior cases with connecting asbestos to lymphoma, I could not ignore the evidence and conclude otherwise.

**{¶38}** Although we agree that certain of the studies Dr. Bedrossian relies upon appear to have a tenuous connection to his causation opinions and note that other studies he relies upon have been described by their authors or others as "controversial" or to demonstrate only a "weakly increased risk" of lymphoma from asbestos exposure, we cannot state that Dr. Bedrossian's reliance upon, and extrapolation from, these studies — in conjunction with his education and training, his expertise related to asbestos-related diseases and prior personal experience with cases involving asbestos-related lymphoma,

and his testimony regarding the biological mechanisms by which asbestos could enter the lymphatic system and cause lymphoma — are outside the certain degree of latitude that may be given to experts in the application of scientific studies to new sets of facts. Ford's criticisms of both the strength of the literature Dr. Bedrossian relies upon and the "fit" between the literature and his opinions go to the credibility of, and the weight to be given, his testimony — issues that Ford argued extensively at trial — and did not preclude their admissibility.

{¶39} Likewise, we find unpersuasive Ford's argument that Dr. Bedrossian's testimony should have been excluded because none of Walker's treating physicians ever made a finding that his Hodgkin's lymphoma was asbestos-related. A treating physician's job is to treat his or her patient, not to determine the cause of a condition. Accordingly, the fact that none of Walker's treating physicians ever stated that Walker's Hodgkin's lymphoma could have been caused by asbestos exposure does not impact the reliability of Dr. Bedrossian's opinions.

{¶40} Similarly, the fact that no asbestos bodies were found in the slides of Walker's tumor did not necessitate a finding that Dr. Bedrossian's opinions were unreliable. Dr. Bedrossian testified that after asbestos fibers cause damage to cells that begin the cancer process, they migrate elsewhere in the body. He explained that he would not expect to find asbestos fibers in the tumor itself because it is a new growth. In *Welsh v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 94068, 2011-Ohio-448, we rejected the argument that the presence of asbestos bodies was a necessary prerequisite to diagnosing asbestos-related colon cancer. *Id.* at ¶ 35. As in *Welsh*, Ford failed to

present any expert testimony in this case to support its argument that the presence of asbestos bodies is a necessary prerequisite for diagnosing asbestos-related cancer. Ford's argument again goes to the issue of credibility. *Id.*

{¶41} Nor does the jury's verdict in favor of Ford on the condition of asbestosis warrant the conclusion that there was insufficient evidence that Walker contracted Hodgkin's lymphoma as a result of his asbestos exposure at Ford. Dr. Bedrossian testified that asbestosis and Hodgkin's lymphoma are separate, independent conditions and that asbestos-related lymphoma can occur in a patient who is exposed to asbestos with or without the development of asbestosis. Once again, Ford did not object to this testimony and did not offer any evidence that an individual could not suffer from an asbestos-related condition in the absence of a finding of asbestosis. To the contrary, Ford's expert, Dr. Harley testified that he himself had been involved in cases where patients were diagnosed with asbestos-related cancers but did not have asbestosis.

{¶42} Giving due consideration to the parties' arguments and following a careful review of the record, we cannot say, based on the record before us — including the aspects of Dr. Bedrossian's testimony to which Ford raised no objection — that the trial court abdicated its role as gatekeeper or otherwise abused its discretion in admitting Dr. Bedrossian's testimony. Dr. Bedrossian's causation opinions were not so fundamentally unsupported that they could not provide assistance to the jury and did not otherwise fail to satisfy the requirements of Evid. R. 702(C). We find that Ford's arguments regarding the deficiencies in Dr. Bedrossian's methodology and its criticism of the authorities he relied upon in support of his opinions go to the weight to be given his testimony, not its

admissibility. Ford had ample opportunity to cross-examine Walker's experts and to present the testimony of its own expert witnesses. Accordingly, Ford's first assignment of error is overruled.

**Sufficiency of the Evidence**

{¶43} In its second and third assignments of error, Ford challenges the sufficiency of the evidence supporting the jury's finding that Walker was entitled to participate in the Ohio workers' compensation system for the condition of Hodgkin's lymphoma. Ford argues that even if Dr. Bedrossian's testimony was sufficiently reliable to survive a *Daubert* challenge, it was insufficient to establish, by a preponderance of the evidence, a "probability of connection" between asbestos exposure and Hodgkin's lymphoma. Ford contends that, given the speculative nature of Dr. Bedrossian's causation testimony, the trial court erred in denying its motion for directed verdict. We disagree.

{¶44} A motion for directed verdict tests the legal sufficiency of the evidence presented by a party. We review de novo a trial court's ruling on a motion for directed verdict. *White v. Leimbach,* 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, ¶ 22.

{¶45} Civ.R. 50(A)(4) provides:

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party,

the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶46} Likewise, when reviewing a sufficiency-of-the-evidence challenge to a jury verdict, the issue is whether, after viewing the evidence in a light most favorable to the prevailing party, the jury's verdict "[is] one which could be reasonably reached from the evidence." *Tech. Constr. Specialties v. Cooper,* 8th Dist. Cuyahoga No. 96021, 2011-Ohio-5252, ¶ 14, citing *Hartford Cas. Ins. Co. v. Easley*, 90 Ohio App.3d 525, 630 N.E.2d 6 (10th Dist.1993). It is a question of law that "does not require the reviewing court to weigh the evidence or test the credibility of witnesses." *Berry v. Lupica*, 196 Ohio App.3d 687, 2011-Ohio-5381, 965 N.E.2d 318, ¶10 (8th Dist.)

{¶47} Ford contends that because its experts explained that there was no reliable medical literature supporting a causal relationship between asbestos exposure and Hodgkin's lymphoma, Dr. Bedrossian's testimony to the contrary was "insufficient to establish more than a mere possibility of cause and effect * * *[to] move beyond the realm of speculation and conjecture," and that Ford was, therefore, entitled to judgment as a matter of law. Ford also contends that Walker failed to present sufficient evidence of causation because there is "no pathologic proof" of Walker's exposure to asbestos and because none of Walker's treating physicians at the Cleveland Clinic ever made a finding that his Hodgkin's lymphoma was asbestos-related. We addressed these arguments above and continue to find them unpersuasive.

{¶48} Construing the evidence most strongly in favor of Walker, we find that Walker presented sufficient evidence to support the jury's verdict that he was entitled to

participate in the Ohio workers' compensation system for the condition of Hodgkin's lymphoma. Walker testified that he worked with and around asbestos-containing pipe covering for nearly 15 years as a resinate core machine operator at Ford. Walker also introduced records, documenting the existence of asbestos-containing products at the facility, during the years he worked there. This evidence was sufficient to establish that Walker was exposed to asbestos while working at Ford. This evidence, along with the expert testimony of Dr. Bedrossian, was also sufficient to establish that the conditions of Walker's employment at Ford resulted in a hazard distinguishing his employment from employment generally and created a risk of contracting Hodgkin's lymphoma in a greater degree and in a different manner than in the public generally. *Krise*, 42 Ohio St.2d 247, 327 N.E.2d 756, at syllabus. Finally, given that Dr. Bedrossian's testimony satisfied the requirements for admissibility under Evid.R. 702, the jury could have reasonably relied on that testimony in finding that the requirements of general and specific causation had been met — i.e., that asbestos exposure could cause Hodgkin's lymphoma and that Walker's Hodgkin's lymphoma was, in fact, caused by his asbestos exposure while working at Ford.

{¶49} Because reasonable minds could have reached more than one conclusion based on the evidence submitted, Ford was not entitled to judgment as a matter of law, and the trial court properly denied Ford's motion for directed verdict. *See Hippely v. Lincoln Elec. Holdings, Inc.*, 8th Dist. Cuyahoga No. 96439, 2011-Ohio-5274, ¶ 24 (where reasonable minds could reach different conclusions based on the opposing expert opinions presented with regard to the cause of plaintiff's disorder, it was not error for the

trial court to deny motion for judgment notwithstanding the verdict). Ford's second and third assignments of error are overruled.

**Manifest Weight of the Evidence**

{¶50} In its final assignment of error, Ford argues that the jury's verdict should be vacated and a new trial granted because it was against the manifest weight of the evidence. Ford asserts that Dr. Bedrossian's testimony was "intentionally designed" to confuse and mislead the jury, causing the jury to speculate on the issue of causation, and that, in light of the testimony from Ford's experts that the medical studies Dr. Bedrossian relied on did not support his opinion, Dr. Bedrossian's opinion that asbestos exposure could cause Hodgkin's lymphoma was not credible.

{¶51} The "manifest weight of the evidence" involves a party's burden of persuasion. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. In *Eastley*, the Ohio Supreme Court made it clear that the *Thompkins* standard of review for manifest weight of the evidence applies in civil as well as criminal cases. *Id.* at ¶ 17. In *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, the Ohio Supreme Court described manifest weight of the evidence as follows:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis omitted.)

*Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

**{¶52}** In assessing whether a jury's verdict is against the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We are, however, guided by a presumption that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273 (1984). This presumption arises because the trier of fact had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* at 80, 461 N.E.2d 1273. Thus, "to the extent that the evidence is susceptible to more than one interpretation," a reviewing court must "construe it consistently with the jury's verdict." *Berry*, 196 Ohio App.3d 687, 2011-Ohio-5381, 965 N.E.2d 318, at ¶ 22, citing *Ross v. Ross*, 64 Ohio St.2d 203, 414 N.E.2d 426 (1980); *see also Seasons Coal* at 81 (a reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court). Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶53}** In this case, we find that the jury's verdict was supported by competent, credible evidence going to all the material elements of Walker's claim. As detailed

above, Walker's testimony established that he had been exposed to asbestos while working at Ford. With respect to the other issues in the case — specifically, the issues of general and specific causation — this was a classic case of a "battle of the experts." Dr. Bedrossian offered one view on the issue of causation, and Ford's experts offered the opposing view. The credibility of the witnesses' testimony was squarely before the jury, and the jury was free to accept or reject any of this testimony. The jury chose to believe Walker's expert over Ford's experts with respect to Walker's Hodgkin's lymphoma claim and Ford's experts over Walker's expert with respect to his asbestosis claim. Given the evidence supporting the jury's verdict and the presumption that the jury's findings of fact are correct, we cannot conclude that the jury's verdict was against the manifest weight of the evidence. *See, e.g.*, *Welsh*, 8th Dist. Cuyahoga No. 94068, 2011-Ohio-448 at ¶ 42 (where testimony of competing experts with opposite opinions was presented to the jury such that the evidence regarding causation was susceptible to more than one interpretation, jury's verdict was not against the manifest weight of the evidence). Ford's fourth assignment of error lacks merit and is overruled.

{¶54} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
MARY EILEEN KILBANE, J., CONCUR